IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRYL ORRIN BAKER,              :
                                 :
        Plaintiff                :
                                 :   CIVIL NO. 1:CV-07-2220
        vs.                      :
                                 :   (Judge Caldwell)
TROY WILLIAMSON, *et al.*,        :
                                 :
        Defendants               :


*M E M O R A N D U M*

I.    *Introduction*

        The pro se plaintiff, Darryl Orrin Baker, filed this
civil-rights action arising from his imprisonment at the Satellite
Prison Camp in Lewisburg, Pennsylvania, (SPC-Lewisburg).[1] The
defendants are: (1) Troy Williamson, the retired warden; (2) C.
Angelini, a unit manager; (3) J. Tokar, a retired counselor; (4)
P. Forbes, a counselor; (5) Dr. A. Bussanich, clinical director;
(6) S. Gosa, a physician's assistant; (7) B. Chambers, a
disciplinary hearing officer; (8) R. Kerstetter, correctional
programs specialist; (9) J. Geradi, a physician's assistant; (10)
Bill True, case manager; (11) B. Ross, a correctional officer; and
(12) Ross Boyd, a correctional officer. They have been sued in
their individual and official capacities.

---

[1] Plaintiff has been released from federal confinement and now
resides in Flint, Michigan.

Plaintiff makes the following civil rights claims: (1) an Eighth Amendment medical claim; (2) a claim for denial of access to the courts; (3) a First Amendment retaliation claim because Plaintiff filed grievances and lawsuits; and (4) equal-protection and racial-discrimination claims.

We are considering the defendants' motion to dismiss some of the claims and for summary judgment on other claims. The motion to dismiss is governed by Fed. R. Civ. P. 12(b)(6), and the motion for summary judgment by Fed. R. Civ. P. 56.

Under Rule 12(b)(6), we must accept as true the factual allegations in the complaint and construe any inferences to be drawn from the allegations in Plaintiff's favor. *See Morrison v. Madison Dearborn Capital Partners III L.P.*, 463 F.3d 312, 314 (3d Cir. 2006). The court is not limited to evaluating the complaint alone. It may consider documents that form the basis of a claim. *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004). It may also consider "documents whose contents are alleged in the complaint and whose authenticity no party questions," even though they "are not physically attached to the pleading . . . ." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002). When appropriate, the court may rely on public records, such as court filings. *See Churchill v. Star Enterprises*, 183 F.3d 184, 190 n.5 (3d Cir. 1999)(citing *Pension Benefit Guaranty Corp.*

*v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

A complaint has to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, ___, 127 S.Ct. 1955, 1974, 167 L.Ed.2d. 929 (2007). Detailed factual allegations are not required, *id*. at ___ , 127 S.Ct. at 1964-65; *Pryor*, *supra,* 288 F.3d at 564, only a "short and plain statement" showing the right to relief. *Pryor*, *supra,* 288 F.3d at 564 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) and quoting Fed. R. Civ. P. 8(a)(2)).

Under Rule 56, "[s]ummary judgment can only be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(c). We 'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007)(quoted case omitted).

II.    *Background*

The amended complaint and the summary judgment record reveal the following background to Plaintiff's claims.[2]

A.   *The Eighth Amendment Medical Claim*

Plaintiff was assaulted on or about February 27, 2004, by two inmates while he was incarcerated at FCI-McKean, Bradford, Pennsylvania. He suffered a blowout fracture of his left eye. The record shows he received the following treatment while at McKean. Some five weeks after the assault, on April 9, 2004, a consultative CT scan was performed. The radiologist who performed the scan and the consulting physician noted that Plaintiff was complaining about double vision when he would look up. The radiologist noted "[no] obvious muscle entrapment," but that "the inferior rectus is very close to the ridge." (Doc. 38-3, CM/ECF p. 8).[3] The consulting physician opined that there were "possible adhesions to the inferior rectus muscle" and advised waiting to see if "the muscle entrapment is resolved." (*Id.*, p. 7). On May 3, 2004, Plaintiff was seen by another consulting physician, who

---

[2] Plaintiff used a court-prepared complaint form and attached to it a typewritten amended complaint, but filed only the form complaint with the court. As the defendants have done, we take the allegations from the complete complaint Plaintiff served on the defendants, which the defendants have docketed at doc. 25-3.

[3] All references to page numbers will be to the CM/ECF pages, even if not specifically designated.

advised waiting six more weeks to see if the double vision resolved before doing anything. (Doc. 44, CM/ECF p. 54). On June 11, 2004, the latter physician advised that Plaintiff still had double vision when looking up and that he believed Plaintiff should have an operation to repair the blowout fracture and release the entrapment. However, he left the decision up to the McKean prison doctor. (Doc. 38-3, CM/ECF p. 10).

At some point, Plaintiff was transferred to FCI-Elkton, Lisbon, Ohio. While incarcerated at Elkton, Plaintiff had another CT scan on March 28, 2005. The physician reviewing the scan noted that there was "[a] small amount of orbital fat extend[ing]" into the area of fracture and that the "left inferior rectus muscle extends to this defect but not through the defect," concluding that the muscle "does not appear to be entrapped." (*Id.*, p. 11). On August 11, 2005, Plaintiff's prison medical records indicate that he refused to cuff up to be taken to his appointment with the eye doctor and noted that Plaintiff continued to have a decrease in his vision, pain in his left eye and double vision when reading. He refused pain medication, saying Motrin and Naprosyn were no help. (*Id.*, p. 12).

On or about August 26, 2005, Plaintiff was transferred to Lewisburg. On January 10, 2006, prison medical records indicate he wanted to see an eye specialist for his blowout fracture. It

-5-

was noted in the record that this was his first complaint at
Lewisburg about the fracture and that at his previous institution
he had refused to see the ophthalmologist. Plaintiff was given 800
mg. tablets of ibubrofen for his pain and was referred for an
ophthalmology consultation. (*Id.*, p. 13).

Thereafter, Plaintiff continued to complain of pain in
his left eye and double vision when he looked up. He was
prescribed pain medication, such as ibuprofen, Naprosyn, and
piroxicam. (*Id.*, pp. 15-34). Often, notes made by medical
personnel would refer to the March 2005 CT scan as establishing
that there was no entrapment of the left inferior rectus muscle.
(*Id.*, pp. 18, 20, 24, and 27).

Plaintiff was scheduled for CT scans while at
Lewisburg. One was scheduled for October 3, 2006, but Plaintiff
did not appear. (*Id.*, p. 27). Plaintiff did have a scan on October
31, 2006. In pertinent part, the report on this scan noted
"chronic post traumatic deformities," "fat between the medial
rectus and the medial wall of the orbit," and the inferior rectus
muscle was "thickened, oriented obliquely and inferiorly
positioned when compared to the contralateral muscle." (*Id.*, p.
29; doc. 44, p. 76). On December 29, 2006, referring to a

consultation made on June 13, 2006, Dr. Bussanich made a note "doubt surgery is the answer." (Doc. 38-3, p. 32).[4]

Plaintiff was transferred to FCI-Sandstone, Sandstone, Minnesota, on or about March 27, 2007. He continued to complain of pain in his left eye. On February 12, 2008, as part of a consultation request, the clinical director there also noted the report on the March 2005 CT scan noting that the inferior rectus muscle was not extending through the fracture site.[5] (Doc. 44, p. 81).

In May 2005, Plaintiff filed a lawsuit in the United States District Court for the Western District of Pennsylvania. Under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680, he sued the United States, FCI-McKean's warden, its medical department and one of the prison's officers for medical malpractice involving the treatment he received for his eye injury. *Baker v. United States*, No. 05-147, 2006 WL 3717382 (W.D. Pa. Dec. 14, 2006).[6]

---

[4] Defendants ascribe this opinion to the consulting physician who saw Plaintiff on June 13, 2006, but it appears to be Dr. Bussanich's opinion.

[5] In the same document, this physician also "doubted that surgery would be helpful," but it is not clear why he wrote this; it may have simply been because about four years had elapsed since the injury.

[6] Plaintiff also asserted he was retaliated against for seeking relief under the FTCA.

In connection with that lawsuit, the district court arranged for counsel to represent Plaintiff and a medical expert was retained. The expert submitted a report that there was medical malpractice in the treatment Plaintiff received at FCI-McKean. (Doc. 51-2, report, dated August 6, 2008). The expert opined as follows. First, within a few days of the injury, after the swelling had subsided, Plaintiff should have received a CT scan.[7] Second, the CT scan would have revealed that the inferior rectus muscle was entrapped because, contrary to the opinion of the physician reviewing the March 2005 CT scan, since the muscle is attached to the fat, entrapment of the fat is the same as entrapment of the muscle.[8] Third, at that time Plaintiff should

---

[7] Plaintiff's first CT scan was not until some five weeks after the injury.

[8] The expert's comment on the initial review of the March 2005 CT scan was as follows:

> [The reviewing physician] noted that a small amount of orbital fat extends into the orbital floor, but it does not entrap the muscle. This is a frequent mistake made by non-subspecialists, when reading the scans. If there is orbital fat immediately contiguous to the muscle and it is entrapped, the muscle is entrapped too. The fat is holding the muscle "prisoner". Thus, although the muscle is not entrapped, the fat is. A simple test such as forced duction test on his eyes would have undoubtedly given the diagnosis. However, this reading of the CT scan undoubtedly led to his denial of treatment.
>
> There are more entries of a similar nature.

(continued...)

have been given the option of having surgery performed, which had an excellent chance of restoring full function, or almost normal function, to the eye. If the first operation was not a success, then there should have been a wait of three to six months and a second operation performed, to "re-align" the eyes "as best possible." (*Id.*, p. 91). On January 21, 2009, the lawsuit was tentatively dismissed as having been settled.

On some unspecified date, defendant True, a counselor, called Plaintiff into his office to sign forms so that Plaintiff could see an outside orbital specialist but Plaintiff never went. (Second Am. Compl. p. 10).

B.   *The Claim for Denial of Access to the Courts*

In addition to the lawsuit above, docketed at No. 05-147, Plaintiff filed a second lawsuit under the FTCA, also against the United States and officials at FCI-McKean, making a claim that he was subjected to prolonged exposure to secondhand smoke.[9] The case was originally filed in the Eastern District of Pennsylvania in April 2005, docketed at No. 05-1540, but was transferred to the

---

[8](...continued)
(Doc. 51-2, p. 94).

[9] This case also alleged retaliation for seeking relief under the FTCA.

Western District in May 2005 on venue grounds, and docketed at No. 05-146.

On July 11, 2006, the court granted the motion of the United States to dismiss that case, or in the alternative, for summary judgment. An internal notation on the docket by the Clerk of Court, dated July 24, 2006, indicates that this order was returned "with the envelope marked 'Not at this address; Return to Sender.'" (Doc. 38-3, p. 49). When Plaintiff later learned the case had been terminated, he attempted to revive his right to a direct appeal, without success. *See Baker v. United States*, 534 F. Supp. 2d 578 (W.D. Pa. 2008).

Plaintiff alleges that defendants R.L. Kerstetter, identified as Lewisburg's mail room supervisor, and B. Chambers, identified as the department head of the mailroom, denied him access to the courts by returning the order to the Western District even though at the time Plaintiff was imprisoned at Lewisburg. (Doc. 25-3, Second Am. Compl. ¶¶ 13-16). He alleges he suffered an actual injury because his case was dismissed and then he lost his appeal rights. (*Id.* ¶ 18).

Plaintiff was incarcerated at FCI-Elkton, Lisbon, Ohio, having been transferred there from FCI-McKean at some point before March 28, 2005. As noted above, he was transferred to SPC-Lewisburg on or about August 26, 2005. The Eastern District

-10-

docket, where the case was filed in April 2005, lists his address as FCI-Elkton. As late as January 22, 2007, the Western District docket, opened in May 2005, listed his address as Elkton as well. (Doc. 45-2, p. 3, docket dated Jan. 22, 2007, Ex. to Reply Br.). In No. 05-146, on February 9, 2007, and about six months after the case had been dismissed, Plaintiff filed a notice with the Clerk of Court to change his address to SPC-Lewisburg. (Doc. 38-3, p. 49, docket sheet in No. 05-146). On January 4, 2006, more than a year earlier, in No. 05-147, he had filed, while he was still pro se in that case, a notice of change of address to Lewisburg.

In No. 05-146, Plaintiff sent two letters, dated December 19, 2005, to the Clerk of Court in the Western District, both listing Lewisburg as his address. (Doc. 44, pp. 25-26). In No. 05-147, he sent three letters to the Clerk, one dated November 28, 2005, another dated December 14, 2005, and the third dated January 12, 2007. (Doc. 44, pp. 20-22). Plaintiff also received at least two envelopes addressed to him at Lewisburg, one dated December 14, 2006. (*Id.*, pp. 27-28).

A Clerk of Court has an internal record of how parties to a case are notified of filings. Plaintiff has supplied such a "notice of electronic filing" in No. 05-147, which indicates that Plaintiff was mailed a notice on October 26, 2006, at SPC-Lewisburg that a report and recommendation of the magistrate judge

-11-

had been filed in that case. (*Id.*, pp. 23-24). In No. 05-146, a review of the notice of electronic filing for the July 11, 2006, order dismissing that case indicates that the order was mailed to Plaintiff at FCI-Elkton, Lisbon, Ohio.

Before the July 11, 2006, dismissal order was entered in No. 05-146, the magistrate judge's report and recommendation was mailed to the parties. The report was mailed to Plaintiff at FCI-Elkton because on July 5, 2006, Plaintiff filed objections to the report and requested that any lateness be excused on the basis that the report had been "first sent to Lisbon, Ohio, where Plaintiff was housed at in 2002." (No. 05-146, doc. 28, Plaintiff's objections to the report and recommendation).[10]

C.  *Retaliation Claims*

Plaintiff alleges that "Lewisburg staff" and defendant C. Angelini, a unit manager, retaliated against him for filing grievances, including his grievance against defendants Kerstetter and Chambers for preventing him from receiving the July 11, 2006, dismissal order. (Second Am. Compl. ¶ 26). He also alleges that they retaliated against him for filing his two lawsuits in the Western District. (*Id.*, ¶ 29). They retaliated in the following

---

[10] Plaintiff attached a copy of the envelope in which he received the report. The envelope indicates the report had been sent to FCI-Elkton, Lisbon, Ohio, and then forwarded by someone at Elkton to Plaintiff's address at SPC-Lewisburg.

ways: (1) taking away Plaintiff's Unicor job for six months; (2) placing Plaintiff in administrative detention for thirty-five days; (3) transferring Plaintiff to FCI-Sandstone, a higher classification prison; and (4) writing a false incident report that Plaintiff had one gambling ticket. (*Id.*, ¶¶ 26 and 31).[11]

> D. *Civil Conspiracy Claim, Equal Protection*
> *Claim and Racial Discrimination Claim*

Plaintiff alleges that the conduct of all the named defendants arose from a conspiracy to retaliate against Plaintiff for filing his grievances and his lawsuits. He also claims their conduct violated equal protection and was motivated by racial discrimination against Plaintiff as an African-American.

III.  *Discussion*

> A. *Plaintiff's* Bivens *Claim Cannot Proceed*
> *Against Defendants in Their Official*
> *Capacities*

Plaintiff has sued the defendants in their official capacities, as well as in their individual capacities. The defendants move to dismiss the claims against them in their

---

[11] Plaintiff also alleges that defendant Ross Boyd, a correctional officer, retaliated against him by filing a false incident report on February 25, 2007, (doc. 44, p. 51), concerning Plaintiff's use of the prison law library and by "repeatedly harassing [him] for being in the law library." (*Id.*, ¶ 27). These allegations are not part of the second amended complaint, so we need not address them.

-13-

official capacities. We agree. As the defendants point out, a plaintiff cannot proceed in a *Bivens* action for damages against the United States or an agency of the federal government for alleged deprivation of a constitutional right, *see FDIC v. Meyer*, 510 U.S. 471, 484-85, 114 S.Ct. 996, 1005, 127 L.Ed.2d 308 (1994), or against any of the individual defendants in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985)(a suit against a government officer in his or her official capacity is a suit against the government). Therefore, Plaintiff's claims against the defendants in their official capacities will be dismissed. *See also Lewal v. Ali*, 289 Fed. Appx. 515, 516 (3d Cir. 2008)(per curiam) (nonprecedential) (dismissing the plaintiff's Eighth Amendment medical claim against the defendants in their official capacities, observing that "[a]n action against government officials in their official capacities constitutes an action against the United States; and *Bivens* claims against the United States are barred by sovereign immunity, absent an explicit waiver").

      B.   *The Eighth Amendment Medical Claim Fails*
          *Because the Record Shows There Was No*
          *Deliberate Indifference*

      In order to establish an Eighth Amendment medical claim, a plaintiff must show "(i) a serious medical need, and (ii)

acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). *See also Rouse v. Plantier*, 182 F.3d 192, 197 (3rd Cir. 1999).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment..." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976).

Accordingly, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." *Id*. at 107, 97 S.Ct. at 293. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990). Further, a doctor's disagreement with the professional

-15-

judgment of another doctor is not actionable under the Eighth Amendment. *See White v. Napoleon,* 897 F.2d 103, 110 (3d Cir. 1990). In sum, negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. *See Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).

Plaintiff's Eighth Amendment medical claim is that the medical defendants, Doctor Bussanich, and physician's assistants Gosa and Geradi, ignored his complaints of pain and failed to provide surgery on his left eye.[12] In moving for summary judgment, Defendants argue that the record fails to show that any of these defendants were deliberately indifferent to a serious medical need.

We agree with the defendants that Plaintiff fails to show deliberate indifference. Plaintiff claims that he should have had surgery, but the record shows that only one physician recommended surgery, in June 2004, and even then that physician indicated he would defer to the prison doctor's judgment. Further, this was while Plaintiff was still at FCI-McKean. This was not simply a matter of a prison doctor's, or physician's assistant's,

---

[12] Plaintiff also named a "Brachas" but, as the defendants note, there was no Brachas in the Lewisburg medical department.

judgment that surgery was not warranted; Plaintiff's blowout fracture was reviewed by consulting physicians. While Plaintiff was still at FCI-McKean, a consulting physician who reviewed the April 2004 scan advised waiting to see if the muscle entrapment was resolved.

Plaintiff was transferred to FCI-Elkton, and while incarcerated there had another CT scan on March 28, 2005. The physician reviewing the scan noted there was "[a] small amount of orbital fat extend[ing]" into the area of fracture and that the "left inferior rectus muscle extends to this defect but not through the defect," concluding that the muscle "does not appear to be entrapped." (*Id.*, p. 11).

Apparently, especially in light of Plaintiff's expert's report, this March 2005 evaluation that the muscle did not appear to be entrapped was crucial to the care Plaintiff would later receive, for after Plaintiff's transfer to Lewisburg on or about August 26, 2005, notes made there by medical personnel often referred to the March 2005 CT scan as establishing that there was no entrapment of the left inferior rectus muscle. (*Id.*, pp. 18, 20, 24, and 27). And on December 29, 2006, Dr. Bussanich made a note "doubt surgery is the answer."

Plaintiff relies on his expert report from No. 05-147, his FTCA medical-malpractice case that settled, but this report

would establish only negligence, and negligence cannot be an Eighth Amendment medical claim. As noted, the expert opined only that there was medical malpractice in not having a CT scan performed within days of the injury and giving Plaintiff the immediate option of surgery. Moreover, the expert may even negate the element of deliberate indifference by tracing the allegedly improper course of treatment to the initial review of the March 2005 CT scan which concluded that entrapment of orbital fat did not mean there was muscle entrapment. The expert called this "a frequent mistake made by non-subspecialists."

Plaintiff also alleges that the defendants ignored his complaints of pain, but the record shows he was given pain medication. We will therefore enter judgment in favor of the following defendants, who were named in the Eighth Amendment medical claim: Doctor Bussanich, and physician's assistants Gosa, Geradi, and counselor True.[13]

---

[13] True was alleged to have called Plaintiff into his office to sign forms so that Plaintiff could see an outside orbital specialist but Plaintiff never went. (Second Am. Compl. p. 10). The defendants argued that this conduct was not an Eighth Amendment violation because all True did was have Plaintiff sign some forms. In opposition, Plaintiff contends that True was part of the civil conspiracy against him. Since we have decided that the Eighth Amendment claim has no merit, the claim against True must also fail.

C.   *The Claim for Denial of Access to*
     *the Courts*

Plaintiff alleges that defendants R.L. Kerstetter, identified as Lewisburg's mail room supervisor, and B. Chambers, identified as the department head of the mailroom, denied him access to the courts, *see Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008), by returning the July 11, 2006, order that dismissed No. 05-146 to the Western District. When Plaintiff later learned of the dismissal, he was unsuccessful in reviving his appeal rights.

The defendants move to dismiss this claim on the following ground. First, Plaintiff must have filed No. 05-146 when he was incarcerated at FCI-Elkton, Lisbon, Ohio, because he was not moved to SPC-Lewisburg until August 26, 2005, and the case was transferred to the Western District in May 2005. However, Plaintiff did not file a notice of change of address until February 9, 2007, some six months after the order was entered. Hence, Plaintiff did not receive the order because he failed to notify the Western District that he had been moved to SPC-Lewisburg, not because Kerstetter and Chambers had interfered with its delivery.[14]

---

[14] The defendants also assert that Plaintiff's claim is that Kerstetter and Chambers sent the order back to the Western District by *stamping* the envelope as "Not at this address; return to Sender."

(continued...)

Among other things, Plaintiff argues in opposition that the order must have been mailed to SPC-Lewisburg because: (1) there were "multiple correspondence and Orders and Motions" in No. 05-146 and No. 05-147, and all were mailed to Plaintiff at Lewisburg yet the defendants argue that the one order dismissing No. 05-146 was not sent to Lewisburg, but to Elkton; (2) Plaintiff sent letters in No. 05-146 and No. 05-147 to the Western District which listed Lewisburg as his address in the body of the letter. Alternatively, Plaintiff argues that the order was simply not sent out by the Clerk of Court. (Doc. 43, Pl.'s Opp'n Br. at p. 10).

We agree with the defendants that the matters of public record, as exhibited by the docket entries in No. 05-146, strongly support the conclusion that neither Kerstetter nor Chambers interfered with Plaintiff's receipt of the dismissal order. Instead, it appears that Plaintiff did not receive the order simply because he failed to notify the Clerk of Court that his address had changed to Lewisburg.

To begin with, No. 05-146 would have been filed while Plaintiff was housed at Elkton. The case was transferred to the Western District in May 2005, before Plaintiff was moved to Lewisburg in August of that year. In fact, Plaintiff filed a

---

[14](...continued)
Plaintiff does not claim that the envelope was stamped, only that it was *marked* return to sender.

motion for extension of time to file a second amended complaint in
No. 05-146 on July 20, 2005, and listed his address as Elkton.[15]
Second, that Plaintiff received at Lewisburg numerous documents
filed in both cases proves nothing as to the crucial fact, whether
on July 11, 2006, the date No. 05-146 was dismissed, his mailing
address was listed as Lewisburg in that case, for Plaintiff did
eventually change his address in that case on February 9, 2007,
and earlier in No. 05-147 on January 4, 2006. Thus it should come
as no surprise that at some point Plaintiff was receiving
documents in *both* cases while he was at Lewisburg. Third, it is
also not probative that Plaintiff sent letters in No. 05-146 and
No. 05-147 to the Western District listing Lewisburg as his
address in the body of the letter. The Clerk of Court cannot be
expected to search a document to see if any address listed is the
same one Plaintiff provided when he began the litigation. Fourth,
and perhaps most significant, if one pulls up the notice of
electronic filing for the July 11, 2006, dismissal order (on the
Clerk's internal docket), it lists Elkton as the address where the
order was sent.[16]

---

[15] The defendants also supply us with a copy of a docket sheet in
No. 05-146, dated January 22, 2007, which also lists Plaintiff's address
as Elkton.

[16] Plaintiff should be familiar with such notices. He submitted one
in No. 05-147 as part of his opposition to the defendants' motions. *See*
(continued...)

-21-

However, we will not dismiss this claim at this time because of the way it has been presented procedurally. The defendants did not move for summary judgment on this claim but instead moved to dismiss. As noted above, on a motion to dismiss, we can consider matters of public record, such as court records, but such records may not fully reveal what happened. We think allowing Plaintiff some discovery would put us in a better position to properly decide this claim, as weak as it seems.

D.   *The Retaliation Claim*

As noted, Plaintiff alleges that "Lewisburg staff" and defendant C. Angelini, a unit manager, retaliated against him for filing grievances, including his grievance against defendants Kerstetter and Chambers for preventing him from receiving the July 11, 2006, dismissal order. He also alleges that they retaliated against him for filing his two lawsuits in the Western District. They retaliated in the following ways: (1) taking away Plaintiff's Unicor job for six months; (2) placing Plaintiff in administrative detention for thirty-five days; (3) transferring Plaintiff to FCI-

---

[16](...continued)
doc. 44, p. 23. That notice indicates that the report and recommendation of the magistrate judge would be mailed to Plaintiff at Lewisburg on October 26, 2006, but is of no relevance to Plaintiff's claim involving No. 05-146 since Plaintiff did file a notice of address change in No. 05-147 on January 4, 2006, some ten months before the October 2006 report.

Sandstone, a higher classification prison; and (4) writing a false incident report that Plaintiff had one gambling ticket.[17]

A prisoner must prove three things to establish a retaliation claim: (1) that he had engaged in a constitutionally protected activity; (2) that he suffered "some adverse action" at the hands of a prison official; and (3) that there is "a causal link between the exercise of [the] constitutional right[ ] and the adverse action taken." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). If the prisoner establishes these three things, "the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id.*

The defendants move to dismiss this claim by arguing that Plaintiff has not shown, and cannot show, that he satisfies the second element of a retaliation claim, that he suffered some adverse action. In support, they point out that Plaintiff was able to exhaust his administrative remedies on the issues presented in this case and was also able to file this lawsuit.

We disagree. An adverse action must be "'sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights.'" *Id*. (quoted case omitted)(brackets in

---

[17]   The other defendants have become part of this claim by way of the civil conspiracy claim.

*Rauser*). We believe that the adverse actions Plaintiff has alleged would deter a person of ordinary firmness from exercising his constitutional rights.

The defendants next make three arguments against the validity of the retaliation claim based on Plaintiff's transfer to Sandstone. First, they argue that Plaintiff has failed to allege the third element of the claim, a causal connection between the filing of his grievances and Western District lawsuits and his transfer. We disagree; the second amended complaint sufficiently alleges a causal connection.

Second, they argue that the claim fails because an inmate has no constitutional right to be in any particular prison. See *Olim v. Wakinekona,* 461 U.S. 238, 245, 103 S.Ct. 1741, 1745, 75 L.Ed.2d 813 (1983)(inmate has no constitutionally protected interest in the place of his confinement). This may be true, but actions that may ordinarily not be actionable can become so if undertaken to retaliate for the exercise of a constitutional right. *Rauser, supra*, 241 F.3d at 333 ("government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right")(quoted cases omitted).

-24-

Third, they argue that the retaliatory-transfer claim fails because his transfer was "likely" the result of his misbehavior, citing a disciplinary infraction for his disruptive behavior when he was told he was too late to take blood test. (Doc. 38, Defs.' Br. in Supp. at p. 13). This argument may have merit but should be made on summary judgment. It is not sufficient on a Rule 12(b)(6) motion.

E.   *The Equal-Protection and Racial-Discrimination Claims*

The defendants move to dismiss the equal-protection and racial-discrimination claims on the ground that Plaintiff's allegations are conclusory and, in the instance of the equal-protection claim, fail to allege that he has been treated differently from similarly situated individuals. We are not persuaded by the briefing the defendants have made on this issue, and so we reject the argument as it has been made here.

IV.   *Conclusion*

We will issue an appropriate order. Our decision means that the Eighth Amendment medical claim is no longer in the case but that the other claims survive: the claim for denial of access to the courts; the retaliation claim for filing grievances and

lawsuits; and (4) the equal-protection and racial-discrimination claim.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: March 13, 2009

```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


   DARRYL ORRIN BAKER,               :
                                     :
                                     :
            Plaintiff                :    CIVIL NO. 1:CV-07-2220
                                     :
        vs.                          :    (Judge Caldwell)
                                     :
                                     :
   TROY WILLIAMSON, et al.,          :
                                     
            Defendants
```

                            *O R D E R*


        AND NOW, this 13th day of March, 2009, it is ordered

that:


            1. The defendants' motion to dismiss
        (doc. 32) is granted in part and denied in
        part as follows:

            a. the claims against the defendants
        in their official capacities are hereby
        dismissed as barred by sovereign immunity.

            b. in all other respects, the motion
        is denied.

            2. The defendants' motion for summary
        judgment (doc. 32) on the Eighth Amendment
        medical claim is granted and the Clerk of
        Court shall enter judgment in favor of the
        following defendants on that claim: Doctor
        Bussanich; physician's assistants Gosa,
        Geradi; and counselor True.



                            /s/William W. Caldwell
                            William W. Caldwell
                            United States District Judge